# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### NORTHEASTERN DIVISION

EASTMAN CHEMICAL COMPANY,⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Plaintiff,⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
v.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)⠀⠀⠀⠀No. _____
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
SGS NORTH AMERICA INC.,⠀⠀⠀⠀⠀)
Serve: Corporation Service Company⠀)
⠀⠀⠀⠀2908 Poston Ave.⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Nashville, TN 37203-1312⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
and⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
SGS MINERALS SERVICES,⠀⠀⠀⠀⠀)
Serve: Jerry Wheeler⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀SGS Mineral Services⠀⠀⠀⠀⠀)
⠀⠀⠀⠀248 Harrogate Industrial Drive⠀)
⠀⠀⠀⠀Harrogate, TN 37752⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)
⠀⠀⠀⠀Defendants.⠀⠀⠀⠀⠀⠀⠀⠀⠀⠀)

## COMPLAINT

Comes the Plaintiff Eastman Chemical Company ("Eastman"), and for its Complaint against the Defendant SGS North America Inc., and SGS Minerals Services, states, avers and alleges upon information and belief, as follows:

### THE PARTIES

1.⠀⠀⠀⠀Eastman is a corporation organized under the laws of the State of Delaware with a principal place of business in Kingsport, Tennessee. Eastman has certificates of authority to conduct business in the State of Tennessee and in the Commonwealth of Virginia.

2.⠀⠀⠀⠀Eastman is engaged in the manufacture and sale of chemicals, fibers, and plastics. Eastman uses steam coal to power certain of its operations.

1

3.    SGS North America Inc., is a corporation organized under the laws of the State of Delaware with a principal place of business at 201 Route 17 FL 7, Rutherford, New Jersey 07070-2597, and a lab located at 248 Harrogate Industrial Drive, Harrogate, Tennessee 37752. SGS North America Inc., is registered to conduct business in both the State of Tennessee and in the Commonwealth of Virginia. SGS North America Inc., can be served through its registered agent Corporation Service Company, 2908 Poston Ave., Nashville, Tennessee 37203-1312.

4.    SGS Minerals Services is a division or business line of SGS North America Inc., with its place of business located at 248 Harrogate Industrial Drive, Harrogate, Tennessee. SGS Minerals Services is not believed by Eastman to have a separate corporate existence from SGS North America Inc.; but to the extent that it has a separate existence, SGS Minerals Services is separately named as a party defendant herein and can be served at 248 Harrogate Industrial Drive, Harrogate, Tennessee 37752, through one of its managing agents such as Jerry Wheeler. [All references to "SGS" and "Defendant" throughout the remainder of this Complaint refer collectively to SGS North America Inc., and SGS Minerals Services.]

5.    SGS provides business services such as the inspection, verification, testing and certification of coal. Those business services are performed through SGS' lab located at 248 Harrogate Industrial Drive, Harrogate, Tennessee 37752.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964.

7.    In addition, this Court has supplemental jurisdiction over the state law claims asserted in this Complaint pursuant to 28 U.S.C. §1367 because the state law claims form part of the same case or controversy as the federal law claims.

8.    Venue is proper in this judicial district pursuant to 18 U.S.C. §1965 and 28 U.S.C. §1391 because SGS is subject to personal jurisdiction in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

*Agreements Between SGS and Eastman*

9.    Eastman was a customer of SGS during all times material to the allegations of this Complaint.

10.    Upon becoming a customer of SGS, and throughout the time material to this Complaint, SGS committed to Eastman to perform the coal sampling and analysis services with integrity, meaning -- trust, honesty, transparency and accountability.   SGS knew that Eastman relied upon SGS' integrity related to SGS' performance of its sampling and analysis services. SGS also knew that it was required to be truthful to Eastman -- with no circumstances justifying lies, deceit or a lack of honesty -- concerning SGS' performance of its sampling and analysis services.  In addition, SGS knew that there were consequences to all of its actions and omissions concerning its performance of its sampling and analysis services, which SGS committed to Eastman to accept with an affirmation not to blame others.  SGS agreed to act ethically, in fairness and with respect toward Eastman in SGS' performance of its sampling and analysis services.

11.    A series of Purchase Orders (the "SGS Purchase Orders") were issued by Eastman to SGS for the sampling and analysis of coal that Eastman was considering to accept from coal suppliers during the time period of January 1, 2010 through December 31, 2012.  The SGS Purchase Orders were accepted by SGS.  The SGS Purchase Orders expressly provided that Eastman may accept coal from the coal suppliers based solely on the analyses of the coal performed by SGS.

12.     Eastman and SGS also entered into a Master Services Agreement dated October 1, 2010 that was signed by David Smercina on behalf of SGS.

13.     Pursuant to the agreements between SGS and Eastman, SGS committed that all coal sampling and analysis services it provided to Eastman were to be performed in the manner consistent with the standards of care, diligence and skill ordinarily exercised by other professionals under similar circumstances in accordance with customarily accepted good and sound professional practices and procedures. SGS also committed that all of its personnel, to include its employees, were required to abide by the terms and provisions of SGS' agreements with Eastman, and to comply with the law. SGS agreed that it had and would maintain complete control over, and be responsible for, all of SGS' personnel and operations.

14.     SGS agreed with Eastman that SGS was not to perform, or enter into any agreement to perform services for any other person, corporation or entity, except with the prior written consent of Eastman, if the performance of the services could result in a conflict of interest with SGS's performance of its coal sampling and analysis for Eastman. SGS further represented that it had disclosed to Eastman in writing any relationships which represent, or could appear to present, a conflict of interest with the coal sampling and analysis services performed for Eastman.

15.     At no time material to this Complaint did SGS ever disclose to Eastman, in writing or otherwise, that any of the coal suppliers (and/or their principals) referenced below, were also themselves customers of SGS.

16.     Eastman paid at least forty-one thousand dollars ($41,000.00) to SGS in consideration for the performance by SGS of its coal sampling and analysis services.

4

*Racketeering Activity Concerning the Coal Supplied by Mountain Energy*

17. Mountain Energy Resources, Inc. ("Mountain Energy") is a corporation organized under the laws of the Commonwealth of Virginia with a principal place of business at 2043 Ramey Flats Road, Clintwood, Virginia 24228. During the time period material to this Complaint, Mountain Energy was wholly owned by Dale Edward Stanley ("Stanley").

18. Mountain Energy was or is in the business of selling coal. Mountain Energy has purchased coal from coal operations in Virginia and/or Kentucky, and the coal was transported by truck to Mountain Energy's tipple facility in Norton, Virginia. Coal sold by Mountain Energy was loaded onto railroad cars and trucks for delivery to its customers -- including deliveries across state lines into Tennessee.

19. In late 2009, Mountain Energy contacted Eastman seeking to sell coal to Eastman. Eastman agreed to purchase certain coal from Mountain Energy in accordance with purchase orders to be issued by Eastman to Mountain Energy.

20. Eastman issued its first purchase order to Mountain Energy for coal in or around January 2010; and between that time and February 1, 2012, Mountain Energy and Eastman directly entered into a series of Purchase Orders for the purchase of coal ("the Mountain Energy Purchase Orders").

21. The Mountain Energy Purchase Orders set forth the minimum acceptable BTU rate and maximum acceptable ash rate for the coal to be provided by Mountain Energy. Eastman required that coal purchased for certain of its operations have a BTU rate of 12,500 BTUs or higher and an ash rate of 10% or lower. This was important as, for instance, coal that did not meet the ash rate specification increased the wear and tear to Eastman's equipment, and

5

increased the consumption of BTUs, which accordingly increased Eastman's costs and expenses in using that coal.

22.     The Mountain Energy Purchase Orders set forth an agreed upon price per ton for coal that met the required specifications. Eastman also paid a "BTU premium" if the coal received had an analysis which exceeded the 12,500 BTU minimum requirement; whereas Mountain Energy's payment was reduced to reflect a "BTU penalty" if the coal received had an analysis which was below the 12,500 BTU minimum requirement.

23.     The Mountain Energy Purchase Orders required that the coal be sampled and analyzed by SGS pursuant to instructions given to Mountain Energy by Eastman.   Those instructions required, among other things, that representative samples be taken of the coal being loaded and sold to Eastman by Mountain Energy, and that those samples be analyzed by SGS with the results certified to Eastman.   The sampling and analysis were to be performed by SGS in accordance with industry standards and in accordance with customarily accepted good and professional practices and procedures.  That analysis included measurements of the BTU and ash rates of coal -- the results of which were used to determine how much Eastman was to pay Mountain Energy for the coal.

24.     As set forth in Paragraph Numbers 9-16 above, which are incorporated herein by reference, Eastman separately contracted with SGS -- as an independent third party inspection, verification, testing and certification company -- to perform the sampling and analysis of the coal that Eastman was purchasing from Mountain Energy pursuant to the Mountain Energy Purchase Orders.

25.     Unbeknownst to Eastman, during the same time period during which SGS was performing the sampling and analyses of the Mountain Energy coal for Eastman, SGS was also

6

performing sampling and analyses of the Mountain Energy coal for Mountain Energy; which created conflicts of interest for SGS and Mountain Energy that neither disclosed to Eastman despite their respective contractual and ethical duties to do so.

26. During the time period relevant to this Complaint, and unbeknownst to Eastman -- SGS personnel (including at least SGS Coal Samplers' Gary Clonce and/or Anthony Wells), SGS (through its personnel), Stanley, and/or Mountain Energy -- associated themselves into an enterprise ("the Mountain Energy Association-In-Fact") wherein they pursued a scheme to defraud, and to steal from, Eastman.

27. In that scheme, SGS personnel responsible for obtaining the coal samples at Mountain Energy in Virginia, knowingly, willfully and with the intent to defraud Eastman, conspired and agreed with Stanley to collect coal samples that they knew were not representative of the coal actually being loaded in Virginia and sold by Mountain Energy to Eastman in Tennessee. Such samples were comprised of coal that had higher BTU rates, and/or lower ash rates, than the coal actually being loaded and sold. One way in which such non-representative samples were achieved was through the preparation of samples comprised of only coal known to have higher BTUs and/or lower ash, while intentionally excluding from those samples coal known to have lower BTUs and/or higher ash. SGS assisted the Mountain Energy Association-In-Fact in knowing the BTU and ash rates of Mountain Energy's stockpiles of coal by means of coal analyses that SGS had performed from Mountain Energy that were separate and apart from the coal analyses that SGS reported to Eastman, and that were without Eastman's knowledge. Once the non-representative samples were prepared, they were knowingly and willfully, with the intent to defraud Eastman, transported by SGS personnel across state lines to Harrogate, Tennessee for analysis in the SGS lab. The results of that analysis were then reported in writing

7

to Eastman, and certified by SGS, to be reflective of the true quality of the coal actually being loaded and sold by Mountain Energy to Eastman. Those results, however, were not reflective of the true quality of the coal actually loaded and sold to Eastman. Instead, as known by the SGS personnel, coal from Mountain Energy stockpiles with lower BTU rates and higher ash rates -- that was not included in the samples collected and analyzed by SGS for Eastman -- were knowingly and willfully, with the intent to defraud Eastman, loaded into the railroad cars for shipment to Eastman.

28. Unbeknownst to Eastman, the aforementioned scheme was continuously pursued from at least February 2010 to February 2012. During that time period, Mountain Energy delivered to Eastman approximately 67,594 tons of coal in 21 shipments occurring in or about: February 2010 (1 delivery), March 2010 (2 deliveries), May 2010 (4 deliveries), June 2010 (2 deliveries), August 2011 (2 deliveries), September 2011 (2 deliveries), October 2011 (2 deliveries), November 2011 (3 deliveries), December 2011 (2 deliveries), and February 2012 (1 delivery). SGS knowingly and willfully, with the intent to defraud Eastman, sampled and analyzed non-representative coal for each of those shipments. SGS' written reports of that sampling and analyses are set forth in Paragraph Numbers 32-54 below, which are incorporated herein by reference. Each of those reports falsely certified a representative BTU rate higher than the BTU rate, and a representative ash rate lower than the ash rate, of the coal actually being loaded and delivered to Eastman by Mountain Energy.

29. Unaware of the fraudulent scheme being perpetrated upon it by the Mountain Energy Association-In-Fact, and in reliance on the sampling and analysis reports received from SGS, Eastman paid SGS for its coal sampling and analysis services, and paid Mountain Energy a premium price (without application of any penalty) for the coal that Eastman actually received.

8

That premium pricing was calculated based upon the BTU rate set forth in each SGS report; for which Mountain Energy then generated false and fraudulent invoices for payment and sent those invoices to Eastman via interstate wire and/or mail communications.

30.     The false and fraudulent invoices from Mountain Energy that were received by Eastman bore dates including but not limited to:  February 12, 2010; April 8, 2010; May 4, 2010; May 13, 2010; May 18, 2010; May 26, 2010; June 4, 2010; June 22, 2010; January 20, 2011; August 4, 2011; August 22, 2011; September 21, 2011; September 30, 2011; October 20, 2011; October 27, 2011; November 9, 2011; November 18, 2011; November 28, 2011; December 21, 2011; December 29, 2011; February 6, 2012; and February 7, 2012.  True and accurate copies of those invoices are attached as Collective Exhibit 1.  Those invoices were sent from Mountain Energy's office in Norton, Virginia, to Eastman's offices in Kingsport, Tennessee.  SGS, through its personnel, knew that the invoices contained false and fraudulent pricing based upon SGS' non-representative coal sampling and analysis results.

31.     SGS personnel received bribe monies and/or other benefits for the performance of their coal sampling and analysis duties through the Mountain Energy Association-In-Fact that were in addition to their regular pay.  SGS also benefited from additional business from Mountain Energy through the scheme of the Mountain Energy Association-In-Fact, as SGS was being paid to analyze the actual quality of Mountain Energy's coal -- the results of which SGS was reporting directly to Mountain Energy and/or Stanley; and not to Eastman, despite SGS' commitment to not engage in coal analyses that posed a conflict of interest toward Eastman.

***Coal Sampling & Analysis Reports on Mountain Energy Coal by SGS to Eastman***

32.     SGS delivered to Eastman its Analysis Report dated February 3, 2010.  A true and accurate copy of this Report is attached in Collective Exhibit 2.  That Report indicated that coal

9

samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on January 29, 2010, and February 1-2, 2010; that the coal samples were received in Tennessee for testing and analysis on February 2, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,602 and a "dry basis" BTU/lb of 13,555; and that the coal had an "as received" % Ash of 8.89 and a "dry basis" % Ash of 9.56 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

33.     SGS delivered to Eastman its Analysis Report dated February 10, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken in Virginia on February 4-5, 2010; that the coal samples were received in Tennessee for testing and analysis on February 5, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,897 and a "dry basis" BTU/lb of 13,513; and that the coal had an "as received" % Ash of 9.05 and a "dry basis" % Ash of 9.48 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

34.     SGS delivered to Eastman its Analysis Report dated March 22, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on March 17-19, 2010; that the coal samples were received in Tennessee for testing and analysis on March 19, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,131 and a "dry basis" BTU/lb of 13,779; and that the coal had an "as received" % Ash of 7.54 and a

10

"dry basis" % Ash of 7.91 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

35. SGS delivered to Eastman its Analysis Report dated April 9, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on April 6-8, 2010; that the coal samples were received in Tennessee for testing and analysis on April 8, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,195 and a "dry basis" BTU/lb of 13,722; and that the coal had an "as received" % Ash of 7.66 and a "dry basis" % Ash of 7.97 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

36. SGS delivered to Eastman its Analysis Report dated May 6, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on April 29-30, 2010 and May 3-4, 2010; that the coal samples were received in Tennessee for testing and analysis on May 4, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,829 and a "dry basis" BTU/lb of 13,459; and that the coal had an "as received" % Ash of 9.50 and a "dry basis" % Ash of 9.97 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

37. SGS delivered to Eastman its Analysis Report dated May 11, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by

11

SGS; that the coal samples were taken on May 7-10, 2010; that the coal samples were received in Tennessee for testing and analysis on May 10, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,929 and a "dry basis" BTU/lb of 13,429; and that the coal had an "as received" % Ash of 9.75 and a "dry basis" % Ash of 10.13 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

38.     SGS delivered to Eastman its Analysis Report dated May 19, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on May 14-18, 2010; that the coal samples were received in Tennessee for testing and analysis on May 18, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,989 and a "dry basis" BTU/lb of 13,610; and that the coal had an "as received" % Ash of 9.03 and a "dry basis" % Ash of 9.46 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

39.     SGS delivered to Eastman its Analysis Report dated May 28, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on May 24-26, 2010; that the coal samples were received in Tennessee for testing and analysis on May 26, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,444 and a "dry basis" BTU/lb of 13,932; and that the coal had an "as received" % Ash of 6.71 and a "dry basis"

% Ash of 6.95 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

40.     SGS delivered to Eastman its Analysis Report dated June 7, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on June 2-4, 2010; that the coal samples were received in Tennessee for testing and analysis on June 4, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,513 and a "dry basis" BTU/lb of 13,951; and that the coal had an "as received" % Ash of 6.40 and a "dry basis" % Ash of 6.61 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

41.     SGS delivered to Eastman its Analysis Report dated June 24, 2010. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on June 17-22, 2010; that the coal samples were received in Tennessee for testing and analysis on June 22, 2010; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,617 and a "dry basis" BTU/lb of 14,003; and that the coal had an "as received" % Ash of 6.14 and a "dry basis" % Ash of 6.31 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

42.     SGS delivered to Eastman its Analysis Report dated August 6, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by

13

SGS; that the coal samples were taken on August 4, 2011; that the coal samples were received in Tennessee for testing and analysis on August 4, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,432 and a "dry basis" BTU/lb of 13,905; and that the coal had an "as received" % Ash of 7.04 and a "dry basis" % Ash of 7.29 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

    43.    SGS delivered to Eastman its Analysis Report dated August 24, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on August 22, 2011; that the coal samples were received in Tennessee for testing and analysis on August 22, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,557 and a "dry basis" BTU/lb of 14,073; and that the coal had an "as received" % Ash of 5.87 and a "dry basis" % Ash of 6.09 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

    44.    SGS delivered to Eastman its Analysis Report dated September 22, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on September 20, 2011; that the coal samples were received in Tennessee for testing and analysis on September 20, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,290 and a "dry basis" BTU/lb of 13,921; and that the coal had an "as received" % Ash of 6.41

14

and a "dry basis" % Ash of 6.71 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

45. SGS delivered to Eastman its Analysis Report dated October 2, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on September 30, 2011; that the coal samples were received in Tennessee for testing and analysis on September 30, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,273 and a "dry basis" BTU/lb of 13,960; and that the coal had an "as received" % Ash of 6.28 and a "dry basis" % Ash of 6.60 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

46. SGS delivered to Eastman its Analysis Report dated October 24, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on October 20, 2011; that the coal samples were received in Tennessee for testing and analysis on October 20, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,315 and a "dry basis" BTU/lb of 13,884; and that the coal had an "as received" % Ash of 6.69 and a "dry basis" % Ash of 6.98 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

47. SGS delivered to Eastman its Analysis Report dated October 29, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 2</u>. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been

taken by SGS; that the coal samples were taken on October 26-27, 2011; that the coal samples were received in Tennessee for testing and analysis on October 27, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,421 and a "dry basis" BTU/lb of 13,875; and that the coal had an "as received" % Ash of 6.29 and a "dry basis" % Ash of 6.50 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

48. SGS delivered to Eastman its Analysis Report dated November 11, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 9, 2011; that the coal samples were received in Tennessee for testing and analysis on November 9, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,292 and a "dry basis" BTU/lb of 13,797; and that the coal had an "as received" % Ash of 7.17 and a "dry basis" % Ash of 7.44 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

49. SGS delivered to Eastman its Analysis Report dated November 21, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 16-18, 2011; that the coal samples were received in Tennessee for testing and analysis on November 18, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,118 and a "dry basis" BTU/lb of 13,778; and that the coal had an "as received" % Ash of 7.54

16

and a "dry basis" % Ash of 7.92 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

50.    SGS delivered to Eastman its Analysis Report dated November 30, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 21-28, 2011; that the coal samples were received in Tennessee for testing and analysis on November 28, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,072 and a "dry basis" BTU/lb of 13,665; and that the coal had an "as received" % Ash of 8.05 and a "dry basis" % Ash of 8.42 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

51.    SGS delivered to Eastman its Analysis Report dated December 23, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on December 19-21, 2011; that the coal samples were received in Tennessee for testing and analysis on December 21, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,117 and a "dry basis" BTU/lb of 13,910; and that the coal had an "as received" % Ash of 6.64 and a "dry basis" % Ash of 7.04 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

52.    SGS delivered to Eastman its Analysis Report dated December 31, 2011. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been

17

taken by SGS; that the coal samples were taken on December 27-29, 2011; that the coal samples were received in Tennessee for testing and analysis on December 29, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,154 and a "dry basis" BTU/lb of 13,989; and that the coal had an "as received" % Ash of 5.47 and a "dry basis" % Ash of 5.82 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

53. SGS delivered to Eastman its Analysis Report dated February 8, 2012. A true and accurate copy of this Report is attached in Collective Exhibit 2. That Report indicated that coal samples had been taken at Mountain Energy in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on February 3-7, 2012; that the coal samples were received in Tennessee for testing and analysis on February 7, 2012; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,838 and a "dry basis" BTU/lb of 13,624; and that the coal had an "as received" % Ash of 9.74 and a "dry basis" % Ash of 10.34 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

54. Each of the SGS Analysis Reports referenced in Paragraph Numbers 32-53 above (among others), contained false and fraudulent information related to the collection of the samples, the methods used in collecting and analyzing the samples, and on the representative nature of the results in relation to the coal actually being loaded and shipped to Eastman.

***Racketeering Activity Concerning Coal Supplied by True Energy***

55. True Energy Services, Inc. ("True Energy") is a corporation organized under the laws of the State of Tennessee with a principal place of business at 401 Hidden Acres Rd., Kingsport, Tennessee 37664-5668. True Energy was or is in the business of selling coal. During

18

the time period material to this Complaint, True Energy was wholly owned by Darrell Grigsby; but unbeknownst to Eastman, the coal being sold by True Energy was coming from Gus Hill and/or Hills Fuel Company. Hills Fuel Company, owned and/or operated by Gus Hill, is a corporation organized under the laws of the Commonwealth of Virginia without a certificate of authority to conduct business in the State of Tennessee.

56.     Darrell Grigsby, on behalf of True Energy, contacted Eastman seeking to sell coal directly to Eastman. Eastman agreed to purchase certain coal from True Energy in accordance with purchase orders to be issued by Eastman to True Energy.

57.     True Energy and Eastman did enter into a series of Purchase Orders for the purchase of coal from on or about June 22, 2011 through on or about February 3, 2012 ("the True Energy Purchase Orders").

58.     The True Energy Purchase Orders set forth the minimum acceptable BTU rate and maximum acceptable ash rate for the coal to be provided by True Energy. Eastman required that coal purchased for certain of its operations have a BTU rate of 12,500 BTUs or higher and an ash rate of 10% or lower. This was important as, for instance, coal that did not meet the ash specification increased the wear and tear to Eastman's equipment, and increased the consumption of BTUs, which accordingly increased Eastman's costs and expenses in using that coal.

59.     The True Energy Purchase Orders set forth an agreed upon price per ton for coal that met the required specifications. Eastman also paid a "BTU premium" if the coal received had an analysis which exceeded the 12,500 BTU minimum requirement.

60.     The True Energy Purchase Orders required that the coal be sampled and analyzed by SGS pursuant to instructions given to True Energy by Eastman. Those instructions required, among other things, that representative samples be taken of the coal being loaded and sold to

19

Eastman by True Energy, and those samples be analyzed by SGS with the analysis results certified to Eastman. The sampling and analysis were to be performed by SGS in accordance with industry standards and in accordance with customarily accepted good and professional practices and procedures. That analysis included measurements of the BTU and ash rates of coal -- the results of which were used to determine how much Eastman was to pay True Energy for the coal.

61.     As set forth in Paragraph Numbers 9-16 above, which are incorporated herein by reference, Eastman separately contracted with SGS -- as an independent third party inspection, verification, testing and certification company -- to perform the sampling and analysis of the coal that Eastman was purchasing from True Energy pursuant to the True Energy Purchase Orders.

62.     Unbeknownst to Eastman, during the same time period during which SGS was performing the sampling and analyses of the True Energy coal for Eastman, SGS was also performing sampling and analyses of the True Energy coal for True Energy, Gus Hill and/or Hills Fuel Company; which created conflicts of interest for SGS and True Energy that neither disclosed to Eastman despite their respective contractual and ethical duties to do so.

63.     During the time period relevant to this Complaint, and unbeknownst to Eastman -- SGS personnel (including at least SGS Coal Samplers' Gary Clonce and/or Anthony Wells), SGS (through its personnel), Darrell Grigsby, David Grigsby, Anthony Middleton, Carl Stone, Hills Fuel Company, Gus Hill and/or True Energy -- associated themselves into an enterprise ("the True Energy Association-In-Fact") wherein they pursued a scheme to defraud, and steal from, Eastman.

64.     In that scheme, SGS personnel responsible for obtaining the coal samples at True Energy in Virginia, knowingly, willfully and with the intent to defraud Eastman, conspired and

agreed with -- Darrell Grigsby, David Grigsby, Anthony Middleton, Carl Stone, Hills Fuel Company, and/or Gus Hill -- to collect coal samples that they knew were not representative of the coal actually being loaded in Virginia and sold by True Energy to Eastman in Tennessee. Such samples were comprised of coal that had higher BTU rates, and/or lower ash rates, than the coal actually being loaded and sold. One way in which such non-representative samples were achieved was through the preparation of samples comprised of only coal known to have higher BTUs and/or lower ash, while intentionally excluding from those samples coal known to have lower BTUs and/or higher ash. SGS assisted the True Energy Association-In-Fact in knowing the BTU and ash rates of True Energy's and/or Hills Fuel Company's stockpiles of coal by means of coal analyses that SGS had performed for True Energy and/or Hills Fuel Company that were separate and apart from the coal analyses that SGS reported to Eastman, and that were without Eastman's knowledge. Once the non-representative samples were prepared, they were knowingly and willfully, with the intent to defraud Eastman, transported by SGS personnel across state lines to Harrogate, Tennessee for analysis in the SGS lab. The results of that analysis were then reported in writing to Eastman, and certified by SGS, to be reflective of the true quality of the coal actually being loaded and sold by True Energy. Those results, however, were not reflective of the true quality of the coal actually loaded and sold to Eastman. Instead, as known by the SGS personnel, coal from True Energy and/or Hills Fuel Company stockpiles with lower BTU rates and higher ash rates -- that was not included in the samples collected and analyzed by SGS for Eastman -- were knowingly and willfully, with the intent to defraud Eastman, loaded into the railroad cars for shipment to Eastman.

65.     Unbeknownst to Eastman, the aforementioned scheme was continuously pursued from at least June 22, 2011 to February 3, 2012. During that time period, True Energy delivered

to Eastman approximately 49,014 tons of coal in 19 shipments occurring in or about: June 2011 (1 delivery), July 2011 (2 deliveries), August 2011 (3 deliveries), September 2011 (2 deliveries), October 2011 (3 deliveries), November 2011 (4 deliveries), December 2011 (2 deliveries), January 2012 (1 delivery) and February 2012 (1 delivery). SGS knowingly and willfully, with the intent to defraud Eastman, sampled and analyzed non-representative coal for each of those shipments. SGS' written reports of that sampling and analyses are set forth in Paragraph Numbers 69-90 below, which are incorporated herein by reference. Each of those reports falsely certified a representative BTU rate higher than the BTU rate, and a representative ash rate lower than the ash rate, of the coal actually being loaded and delivered to Eastman by True Energy.

66.     Unaware of the fraudulent scheme being perpetrated upon it by the True Energy Association-In-Fact, and in reliance on the sampling and analysis reports received from SGS, Eastman paid SGS for its coal sampling and analysis services, and paid True Energy a premium price for the coal that Eastman actually received (at least a portion of which True Energy paid to Gus Hill and/or Hills Fuel Company in Virginia). That premium pricing was calculated based upon the BTU rate set forth in each SGS report; for which True Energy then generated false and fraudulent invoices for payment and sent those invoices to Eastman via interstate wire and/or mail communications.

67.     The false and fraudulent invoices from True Energy that were received by Eastman bore dates to include but not be limited to: July 8, 2011, July 19, 2011, July 25, 2011, August 5, 2011, August 17, 2011, August 26, 2011, September 6, 2011, September 23, 2011, September 30, 2011, October 19, 2011, October 22, 2011, November 12, 2011, November 14, 2011, November 19, 2011, December 1, 2011, December 19, 2011, December 20, 2011, January 2, 2012, February 10, 2012, and February 22, 2012. True and accurate copies of those invoices

are attached as <u>Collective Exhibit 3</u>. Those invoices were sent from True Energy, in coordination with Gus Hill and/or Hills Fuel Company in Virginia, to Eastman's offices in Kingsport, Tennessee. SGS, through its personnel, knew that the invoices contained false and fraudulent pricing based upon SGS' non-representative coal sampling and analysis results.

68. SGS personnel received bribe monies and/or other benefits for the performance of their coal sampling and analysis duties through the True Energy Association-In-Fact that were in addition to their regular pay. SGS also benefited from additional business from True Energy, Gus Hill and/or Hills Fuel Company through the scheme of the True Energy Association-In-Fact, as SGS was being paid to analyze the actual quality of True Energy's and/or Hills Fuel Company's coal -- the results of which SGS was reporting directly to True Energy, Darrell Grigsby, Gus Hill and/or Hills Fuel Company; and not to Eastman, despite SGS' commitment to not engage in coal analyses that posed a conflict of interest toward Eastman.

***Coal Sampling & Analysis Reports on True Energy Coal by SGS to Eastman***

69. SGS delivered to Eastman its Analysis Report dated June 16, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at True Energy; that the coal samples had been taken by SGS; that the coal samples were taken on June 10, 2011; that the coal samples were received in Tennessee for testing and analysis on June 10, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,428 and a "dry basis" BTU/lb of 13,802; and that the coal had an "as received" % Ash of 7.78 and a "dry basis" % Ash of 8.00 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

23

70.     SGS delivered to Eastman its Analysis Report dated June 29, 2011.  A true and accurate copy of this Report is attached in Collective Exhibit 4.  That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on June 24-28, 2011; that the coal samples were received in Tennessee for testing and analysis on June 28, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,248 and a "dry basis" BTU/lb 13,888; and that the coal had an "as received" % Ash of 7.31 and a "dry basis" % Ash of 7.66 (amongst other results and sampling information).  The Report was signed by an SGS representative, namely Edward Pendleton.

71.     SGS delivered to Eastman its Analysis Report dated July 18, 2011.  A true and accurate copy of this Report is attached in Collective Exhibit 4.  That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on July 14-16, 2011; that the coal samples were received in Tennessee for testing and analysis on July 16, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,772 and a "dry basis" BTU/lb 13,754; and that the coal had an "as received" % Ash of 7.55 and a "dry basis" % Ash of 8.13 (amongst other results and sampling information).  The Report was signed by an SGS representative, namely Edward Pendleton.

72.     SGS delivered to Eastman its Analysis Report dated July 28, 2011.  A true and accurate copy of this Report is attached in Collective Exhibit 4.  That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on July 25-27, 2011; that the coal samples were received in Tennessee for testing and analysis on July 27, 2011; that ASTM methods were used

by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,035 and a "dry basis" BTU/lb of 13,835; and that the coal had an "as received" % Ash of 7.40 and a "dry basis" % Ash of 7.85 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

73. SGS delivered to Eastman its Analysis Report dated August 12, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on August 9-10, 2011; that the coal samples were received in Tennessee for testing and analysis on August 10, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,833 and a "dry basis" BTU/lb of 13,556; and that the coal had an "as received" % Ash of 8.66 and a "dry basis" % Ash of 9.15 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

74. SGS delivered to Eastman its Analysis Report dated August 22, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on August 18-19, 2011; that the coal samples were received in Tennessee for testing and analysis on August 19, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,638 and a "dry basis" BTU/lb of 13,521; and that the coal had an "as received" % Ash of 8.76 and a "dry basis" % Ash of 9.37 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

75.     SGS delivered to Eastman its Analysis Report dated September 2, 2011.  A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>.  That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on August 25-31, 2011; that the coal samples were received in Tennessee for testing and analysis on August 31, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,333 and a "dry basis" BTU/lb of 13,717; and that the coal had an "as received" % Ash of 8.29 and a "dry basis" % Ash of 8.53 (amongst other results and sampling information).  The Report was signed by an SGS representative, namely Edward Pendleton.

76.     SGS delivered to Eastman its Analysis Report dated September 12, 2011.  A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>.  That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on September 9-10, 2011; that the coal samples were received in Tennessee for testing and analysis on September 10, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,897 and a "dry basis" BTU/lb of 13,564; and that the coal had an "as received" % Ash of 9.32 and a "dry basis" % Ash of 9.80 (amongst other results and sampling information).  The Report was signed by an SGS representative, namely Edward Pendleton.

77.     SGS delivered to Eastman its Analysis Report dated September 16, 2011.  A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>.  That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on September 12-14, 2011; that the coal samples were received in Tennessee for testing and analysis on September 14, 2011; that ASTM methods

26

were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,182 and a "dry basis" BTU/lb of 13,654; and that the coal had an "as received" % Ash of 8.71 and a "dry basis" % Ash of 9.02 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

78.     SGS delivered to Eastman its Analysis Report dated October 3, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on September 28-30, 2011; that the coal samples were received in Tennessee for testing and analysis on September 30, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,694 and a "dry basis" BTU/lb of 13,294; and that the coal had an "as received" % Ash of 10.18 and a "dry basis" % Ash of 10.66 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

79.     SGS delivered to Eastman its Analysis Report dated October 12, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on October 7-10, 2011; that the coal samples were received in Tennessee for testing and analysis on October 10, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,120 and a "dry basis" BTU/lb of 13,602; and that the coal had an "as received" % Ash of 8.18 and a "dry basis" % Ash of 8.48 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

27

80.     SGS delivered to Eastman its Analysis Report dated October 31, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on October 26-27, 2011; that the coal samples were received in Tennessee for testing and analysis on October 27, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,110 and a "dry basis" BTU/lb of 13,700; and that the coal had an "as received" % Ash of 7.89 and a "dry basis" % Ash of 8.25 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

81.     SGS delivered to Eastman its Analysis Report dated November 7, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 2-4, 2011; that the coal samples were received in Tennessee for testing and analysis on November 4, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,814 and a "dry basis" BTU/lb of 13,548; and that the coal had an "as received" % Ash of 9.03 and a "dry basis" % Ash of 9.55 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

82.     SGS delivered to Eastman its Analysis Report dated November 17, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 11, 2011; that the coal samples were received in Tennessee for testing and analysis on November 15, 2011; that ASTM methods

28

were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,560 and a "dry basis" BTU/lb of 13,382; and that the coal had an "as received" % Ash of 10.23 and a "dry basis" % Ash of 10.90 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

83.     SGS delivered to Eastman its Analysis Report dated November 26, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 22-23, 2011; that the coal samples were received in Tennessee for testing and analysis on November 23, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,679 and a "dry basis" BTU/lb of 13,692; and that the coal had an "as received" % Ash of 8.19 and a "dry basis" % Ash of 8.84 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

84.     SGS delivered to Eastman its Analysis Report dated December 3, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on November 30, 2011 and December 1, 2011; that the coal samples were received in Tennessee for testing and analysis on December 1, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,778 and a "dry basis" BTU/lb of 13,614; and that the coal had an "as received" % Ash of 9.08 and a "dry basis" % Ash of 9.67 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

29

85.     SGS delivered to Eastman its Analysis Report dated December 10, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on December 5-8, 2011; that the coal samples were received in Tennessee for testing and analysis on December 8, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,416 and a "dry basis" BTU/lb of 14,026; and that the coal had an "as received" % Ash of 6.33 and a "dry basis" % Ash of 6.62 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

86.     SGS delivered to Eastman its Analysis Report dated December 19, 2011. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on December 14-16, 2011; that the coal samples were received in Tennessee for testing and analysis on December 16, 2011; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,199 and a "dry basis" BTU/lb of 13,992; and that the coal had an "as received" % Ash of 6.68 and a "dry basis" % Ash of 7.08 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

87.     SGS delivered to Eastman its Analysis Report dated January 30, 2012. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on January 26-27, 2012; that the coal samples were received in Tennessee for testing and analysis on January 27, 2012; that ASTM methods were

30

used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 12,518 and a "dry basis" BTU/lb of 13,555; and that the coal had an "as received" % Ash of 8.97 and a "dry basis" % Ash of 9.71 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

88.    SGS delivered to Eastman its Analysis Report dated January 31, 2012. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at True Energy; that the coal samples had been taken by True Energy; that the coal samples were taken on January 27, 2012; that the coal samples were received in Tennessee for testing and analysis on January 27, 2012; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,225 and a "dry basis" BTU/lb of 14,102; and that the coal had an "as received" % Ash of 6.21 and a "dry basis" % Ash of 6.62 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

89.    SGS delivered to Eastman its Analysis Report dated February 10 and 11, 2012. A true and accurate copy of this Report is attached in <u>Collective Exhibit 4</u>. That Report indicated that coal samples had been taken at the Andover Tipple in Virginia; that the coal samples had been taken by SGS; that the coal samples were taken on February 7-9, 2012; that the coal samples were received in Tennessee for testing and analysis on February 9, 2012; that ASTM methods were used by SGS in performance of its services; that the coal had an "as received" BTU/lb of 13,098 and a "dry basis" BTU/lb of 13,958; and that the coal had an "as received" % Ash of 5.80 and a "dry basis" % Ash of 6.18 (amongst other results and sampling information). The Report was signed by an SGS representative, namely Edward Pendleton.

31

90.     Each of the SGS Analysis Reports referenced in Paragraph Numbers 69-89 above (among others), contained false and fraudulent information related to the collection of the samples, the methods used in collecting and analyzing the samples, and on the representative nature of the results in relation to the coal actually being loaded and shipped to Eastman.

*January 2012 Anonymous Letter to Eastman*

91.     In January 2012, Eastman received an anonymous letter postmarked January 3, 2012 that informed Eastman for the first time of the aforementioned schemes to defraud and steal from Eastman, perpetrated by the Mountain Energy Association-In-Fact and the True Energy Association-In-Fact, including SGS.

92.     After receiving the anonymous letter, Eastman arranged for a third party to conduct sampling and analysis on shipments of coal received from Mountain Energy and True Energy. That testing revealed that the results in the SGS analysis reports for those shipments certified a higher BTU rate, and a lower ash rate, than was actually contained in those shipments; thereby confirming the aforementioned schemes described in the anonymous letter.

*Confirmation of Racketeering Scheme Concerning Coal from Mountain Energy After Receipt of Anonymous Letter*

93.     Unbeknownst to Eastman, on December 27-29, 2011, railroad cars of coal for shipment to Eastman were loaded with coal known by the persons in the Mountain Energy Association-In-Fact, to have a higher ash rate and lower BTU rate than required by the Eastman specifications. This shipment was sent to Eastman by Mountain Energy on December 29, 2011.

94.     Instead of properly collecting a representative sample from that December 29, 2011 coal shipment, an SGS employee, in collusion with Stanley and/or Mountain Energy, knowingly, willfully and with the intent to defraud Eastman, took at Mountain Energy in Virginia, and submitted for analysis in Harrogate, Tennessee, a sample of coal that was not

32

representative of the coal actually loaded in the railroad cars. SGS certified the analysis of that sample to be representative of the coal loaded and shipped in SGS' aforementioned December 31, 2011 report to Eastman -- indicating an ash rate of 5.47% and a BTU rate of 13,154.

95.     After Eastman's receipt of the aforementioned anonymous letter, it had the December 29, 2011 coal shipment sampled and analyzed by a third party testing company. The results of that analysis showed that the coal actually delivered to Eastman had an average ash rate of approximately 16.57% and a BTU rate of approximately 10,865. As such, the coal actually delivered to Eastman by Mountain Energy not only failed to meet Eastman's BTU rate and ash rate specifications, but also it did not warrant any premium pricing.

96.     On January 23, 2012, Eastman (in Kingsport, Tennessee) received via email from Mountain Energy (in Norton, Virginia) an invoice for the shipment of coal sent to Eastman on December 29, 2011. In addition to seeking payment of $253,971.70 for the approximately 3,060 tons of coal shipped, Mountain Energy also sought payment of a BTU premium in the amount of $13,287.79. That premium had been calculated on the falsely and fraudulently manipulated analysis results from SGS -- which SGS, SGS' personnel, Stanley, and Mountain Energy knew to be false and fraudulent.

*Dale Stanley's Guilty Plea*

97.     On or about April 8, 2013, Stanley pled guilty to wire fraud under 18 U.S.C. § 1343 in the United States District Court for the Eastern District of Tennessee (at Greeneville) in connection with the shipment of coal by Mountain Energy to Eastman and the sampling and analysis of that coal by SGS and its personnel.

98.     On or about July 8, 2014, the United States District Court for the Eastern District of Tennessee (at Greeneville) found that Eastman had paid $654,688.33 in penalty/premium and

freight losses for the first 19 shipments of coal from Mountain Energy, plus $32,526.74 for the freight costs for the 20th shipment of coal (the December 2011 shipment) from Mountain Energy. That Court also acknowledged that additional damages may be recoverable by Eastman in a civil proceeding.

### *Confirmation of Racketeering Scheme Concerning Coal from True Energy After Receipt of Anonymous Letter*

99. Unbeknownst to Eastman, on February 7-9, 2012, railroad cars of coal for shipment to Eastman were loaded with coal known by the persons in the True Energy Association-In-Fact, to have a lower BTU rate than required by the Eastman specifications. This shipment was sent to Eastman in Kingsport, Tennessee, by True Energy from the Andover Tipple in Virginia, on February 10, 2012.

100. Instead of properly collecting a representative sample from that February 10, 2012 coal shipment, an SGS employee, in collusion with -- Gus Hill, Darrell Grigsby, David Grigsby and/or Hills Fuel Company -- knowingly, willfully and with the intent to defraud Eastman, took at the Andover Tipple in Virginia, and submitted for analysis in Harrogate, Tennessee, a sample of coal that was not representative of the coal actually loaded in the railroad cars. SGS certified the analysis of that sample to be representative of the coal loaded and shipped in SGS' aforementioned February 10, 2012 report to Eastman -- indicating an ash rate of 5.80% and a BTU rate of 13,098.

101. After Eastman's January 4, 2012 receipt of the aforementioned anonymous letter, it had the February 10, 2012 coal shipment sampled and analyzed by a third party testing company. The results of that analysis showed that the coal actually delivered to Eastman had an average ash rate of approximately 8.19% and a BTU rate of approximately 12,088. As such, the

34

coal actually delivered to Eastman by True Energy not only failed to meet Eastman's BTU rate specifications, but also it did not warrant any premium pricing.

102.    On February 22, 2012, True Energy in Tennessee generated an invoice -- the content of which was in coordination with Gus Hill, David Grigsby and/or Hills Fuel Company in Virginia -- for the shipment of coal sent to Eastman on February 10, 2012, and then sent that invoice via email and/or U.S. Mail to Eastman in Kingsport, Tennessee. In addition to seeking payment of $275,003.10 for the approximately 3,395.1 tons of coal shipped, True Energy also sought payment of a BTU premium in the amount of $11,135.93. The premium had been calculated on the falsely and fraudulently manipulated analysis from SGS -- which SGS, SGS' personnel, Gus Hill, Darrell Grigsby, David Grigsby, Hills Fuel Company, and True Energy knew to be false.

*Confirmation Under Oath of Racketeering Scheme by SGS Sampler*

103.    Anthony Wells was an SGS employee whose job responsibilities at SGS included the sampling of coal at coal suppliers for SGS' customers and the submission of those coal samples to the SGS lab in Harrogate, Tennessee for analysis -- the results of which were reported to the SGS' customer contracting for the sampling and analysis services.

104.    Anthony Wells was an SGS employee responsible for taking representative coal samples from True Energy of the coal that True Energy was loading and selling to Eastman, and submitting those samples to the SGS lab for analysis -- the results of which were to be reported to Eastman and relied upon by Eastman in paying invoices for coal sold to it by True Energy.

105.    On or about May 14, 2013, Anthony Wells admitted to the True Energy Association-In-Fact's racketeering scheme concerning the sampling and analysis of coal during the period from at least June 22, 2011 to February 3, 2012 that was willfully and knowingly, with

35

the intent to defraud Eastman, not representative of the coal actually being sold by True Energy to Eastman. That testimony occurred in the case of *United States of America v. David Wayne Grigsby*, Docket No. CR-2-13-04, in the United States District Court for the Eastern District of Tennessee (at Greeneville).

106.    During the course and scope of his sampling and analysis obligations with SGS, Anthony Wells conspired and agreed with others in the True Energy Association-In-Fact to take non-representative samples of the coal being loaded and sold to Eastman by True Energy in exchange for the payment of $200 to $300 per non-representative sample.

107.    The non-representative samples of coal taken by Anthony Wells were in coordination with Gus Hill, and/or other employees of Hills Fuel Company (including but not limited to David Grigsby, Anthony Middleton, and/or Carl Stone).

108.    At the time that Anthony Wells was taking the non-representative samples of coal being loaded and sold to Eastman by True Energy, he knew that the samples and analysis thereof would impact how much Eastman would have to pay to purchase the coal being loaded onto each train.

109.    In preparing the non-representative samples of coal, Anthony Wells also took samples of coal for Hills Fuel Company for analysis in the SGS lab -- the results of which were then used by the True Energy Association-In-Fact to determine how much stoker coal (high quality coal) would need to be added to the samples of that coal that Anthony Wells would then submit for analysis in the SGS lab for Eastman.

110.    Anthony Wells personally observed lower quality coal being layered into train cars being shipped to Eastman at the time that Anthony Wells took samples of coal from True

36

Energy, but Anthony Wells intentionally did not include any such lower quality coal in the samples he collected for analysis in the SGS lab.

111.    Anthony Wells was paid -- both his regular and overtime wages by SGS and additional monies by Gus Hill -- for the non-representative samples that he took at True Energy and submitted for analysis to the SGS lab for Eastman.

## COUNT ONE:  RICO §1962(c)
## MOUNTAIN ENERGY ASSOCIATION-IN-FACT

112.    The allegations in Paragraph Numbers 1-54 and 91-98 above are incorporated herein by reference.

113.    The Mountain Energy Association-In-Fact is, or at all relevant times was, an enterprise engaged in and whose activities affect interstate commerce.

114.    SGS, directly or through its personnel, agreed to and did conduct and participate in the conduct of the affairs of the Mountain Energy Association-In-Fact through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding, and stealing from, Eastman.  That conduct and participation included, but is not necessarily limited to, the willful and knowing, with the intent to defraud Eastman, collection of non-representative coal samples by SGS personnel at Mountain Energy in Virginia, and the transportation of those samples across state lines to SGS' lab in Harrogate, Tennessee; wherein the SGS personnel who collected the samples directed other SGS personnel in the lab to analyze those samples and report the results to Eastman on behalf of SGS via electronic transmission and/or regular U.S. Mail; even though the SGS personnel who collected the samples knew that the samples analyzed were not representative of the coal actually being loaded in Virginia and sold to Eastman in Tennessee by Mountain Energy.

115. False and fraudulent invoices for payment of coal were willfully, knowingly and with the intend to defraud Eastman, generated and sent to Eastman on behalf of Mountain Energy via interstate wire and/or mail communications, with the amounts reflected therein being based upon the false and fraudulent coal sampling and analysis results certified by SGS.

116. In reliance on the false and fraudulent sampling and analysis by SGS, Eastman paid SGS for its services, and paid to Mountain Energy the false and fraudulent premium price reflected in the invoices for the coal actually delivered even though (unbeknownst to Eastman) the coal that was delivered was of a lesser quality that did not warrant such a premium price.

117. The SGS personnel who obtained the coal samples received bribe monies and/or other benefits for the performance of their coal sampling and analysis duties through the Mountain Energy Association-In-Fact that were in addition to their regular pay.

118. SGS benefited from additional business from Mountain Energy through the scheme of the Mountain Energy Association-In-Fact, as SGS was paid to analyze the actual quality of Mountain Energy's coal -- the results of which SGS was reporting directly to Mountain Energy and/or Stanley; and not to Eastman, despite SGS' commitment to not engage in coal analyses that posed a conflict of interest toward Eastman. With the Mountain Energy Association-In-Fact using those analyses to determine what coal needed to be used for the non-representative Eastman coal samples.

119. Pursuant to and in furtherance of the false and fraudulent scheme of the Mountain Energy Association-In-Fact, SGS, through its personnel committed multiple related acts continuously during at least the period from February 2010 to February 2012.

120. Each and every non-representative coal sample that was taken across state lines by SGS personnel in furtherance of the false and fraudulent scheme of the Mountain Energy

38

Association-In-Fact violates the interstate transportation in aid of racketeering enterprises act codified at 18 U.S.C. §1952, and constitutes fraud and swindles in violation of 18 U.S.C. §1341 (among other applicable laws); perpetrated by the persons involved in the Mountain Energy Association-In-Fact, including SGS.

121.    Each and every shipment of coal that contained lower quality coal that was not included in the SGS coal samples for that shipment, and that was shipped across state lines by Mountain Energy in furtherance of the false and fraudulent scheme of the Mountain Energy Association-In-Fact violates the interstate transportation in aid of racketeering enterprises act codified at 18 U.S.C. §1952, and constitutes fraud and swindles in violation of 18 U.S.C. §1341 (among other applicable laws); perpetrated by the persons involved in the Mountain Energy Association-In-Fact, including SGS.

122.    Each and every false and fraudulent coal sample analysis report certified and sent by SGS to Eastman by mail and/or interstate wire communications constitutes mail fraud under 18 U.S.C. §1341, wire fraud under 18 U.S.C. §1343, fraud and false statements under 18 U.S.C. §1001, and/or false statements under Va. Code. §18.2-186 (among other applicable laws); perpetrated by the persons involved in the Mountain Energy Association-In-Fact, including SGS.

123.    Each and every false and fraudulent invoice, derived from a correspondingly false and fraudulent SGS analysis report, and sent from Mountain Energy to Eastman through mail and/or interstate wire communications constitutes mail fraud under 18 U.S.C. §1341, wire fraud under 18 U.S.C. §1343, fraud and false statements under 18 U.S.C. §1001, and false statements under Va. Code §18.2-186 (among other applicable laws); perpetrated by the persons involved in the Mountain Energy Association-In-Fact, including SGS.

124.     Each and every payment received by Mountain Energy from Eastman in payment of a false and fraudulent invoice sent by Mountain Energy, and derived from a correspondingly false and fraudulent SGS analysis report, constitutes theft, larceny and/or embezzlement in violation of 18 U.S.C. §659, *Tenn. Code Ann.* §39-14-101, *et. seq.*, and/or Va. Code §§ 18.2-95, 18.2-111, 18.2-178, and 18.2-186 (among other applicable laws), from Eastman; perpetrated by the persons involved in the Mountain Energy Association-In-Fact, including SGS.

125.     Each and every payment of money or other benefits to SGS personnel for non-representative coal samples for analysis constitutes bribery in violation of 18 U.S.C. §1952, and Va. Code §18.2-444 (among other applicable laws); perpetrated by the persons involved in the Mountain Energy Association-In-Fact, including SGS.

126.     Every person and entity involved in the racketeering activities of the Mountain Energy Association-In-Fact, including SGS, have joint and several liability to Eastman.

127.     SGS is vicariously liable for the acts and omissions of its personnel involved in the Mountain Energy Association-In-Fact via the doctrine of respondeat superior. The employment of the SGS personnel with SGS required them to take coal samples from Mountain Energy that were representative of the coal being loaded and sold by Mountain Energy to Eastman, and to analyze those samples and report the results therefrom directly to Eastman; all in accordance with SGS' contractual duties to Eastman. As the master of its personnel, SGS is responsible for ensuring that its personnel took the samples from Mountain Energy in a manner consistent with the standards of care, diligence, and skill ordinarily exercised by other professionals under similar circumstances, and in accordance with customarily accepted good and sound professional practices and procedures; that the SGS analysis and reporting thereof to Eastman related to coal that was representative of the coal actually being loaded and sold by

40

Mountain Energy to Eastman; and that SGS' personnel complied with the law. SGS committed to having and maintaining complete control over its personnel and to being responsible for all of its personnel and operations.

128.    Alternatively, SGS ratified the acts and omissions of its personnel via its certifications of the coal sampling and analysis in each of the SGS' analysis reports of Mountain Energy coal that SGS sent to Eastman; thereby making SGS a direct participant in the Mountain Energy Association in Fact.

129.    The acts and omissions set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

130.    SGS has directly or indirectly conducted and participated in the conduct of the affairs of the Mountain Energy Association-In-Fact through the pattern of racketeering and activity described above, in violation of 18 U.S.C. §1962(c).

131.    As a direct and proximate result of SGS' racketeering activities and violations of 18 U.S.C. §1962(c), Eastman has been injured in its business and property in that it has paid at least $654,688.33 in penalty/premium and freight losses for the first 19 shipments of coal from Mountain Energy, plus $32,526.74 for the freight costs for the 20th shipment of coal (the December 2011 shipment) from Mountain Energy. In addition, Eastman has incurred unreimbursed expenses including but not necessarily limited to transportation, demurrage, and handling expenses for the fraudulent coal delivered to Eastman; increased overhead expenses incurred by Eastman in burning lower quality coal without prior notice; costs of purchasing additional coal to make up for lost BTUs in the coal provided by Mountain Energy; and damage and excessive wear to Eastman's equipment caused by the burning of lower quality coal without

41

prior notice. Eastman has also incurred damages related to payments made to SGS for performance of its fraudulent coal sampling and analysis, and attorneys' fees and costs.

132. In accordance with 18 U.S.C. §1964(c), Eastman is entitled to recover threefold the damages it has sustained and the cost of this suit, including a reasonable attorney's fee.

**COUNT TWO:  RICO §1962(c)**
**TRUE ENERGY ASSOCIATION-IN-FACT**

133. The allegations in Paragraph Numbers 1-16, 55-92 and 99-111 above are incorporated herein by reference.

134. The True Energy Association-In-Fact is, or was at all relevant times, an enterprise engaged in and whose activities affect interstate commerce.

135. SGS, directly or through its personnel, agreed to and did conduct and participate in the conduct of the affairs of the True Energy Association-In-Fact through a pattern of racketeering activity and for the unlawful purpose of intentionally defrauding, and stealing from, Eastman. That conduct and participation included, but is not necessarily limited to, the willful and knowing, with the intent to defraud Eastman, collection of non-representative coal samples by SGS personnel at True Energy and at the Andover Tipple in Virginia, and the transportation of those samples across state lines to SGS' lab in Harrogate, Tennessee; wherein the SGS personnel who collected the samples directed other SGS personnel in the lab to analyze those samples and report the results to Eastman on behalf of SGS via electronic transmission and/or regular U.S. Mail; even though the SGS personnel who collected the samples knew that the samples analyzed were not representative of the coal actually being loaded in Virginia and sold to Eastman in Tennessee by True Energy.

136. False and fraudulent invoices for payment of coal were willfully, knowingly and with the intent to defraud Eastman, generated at least in part in Virginia and sent to Eastman in

Tennessee on behalf of True Energy via wire and/or mail communications, with the amounts reflected therein being based upon the false and fraudulent coal sampling and analysis results certified by SGS.

137. In reliance on the false and fraudulent sampling and analysis by SGS, Eastman paid SGS for its services, and paid to True Energy the false and fraudulent premium price reflected in the invoices for the coal actually delivered even though (unbeknownst to Eastman) the coal was of a lesser quality that did not warrant such a premium price.

138. The SGS personnel who obtained the coal samples received bribe monies and/or other benefits for the performance of their coal sampling and analysis duties through the True Energy Association-In-Fact that were in addition to their regular pay.

139. SGS benefited from additional business from True Energy, Hills Fuel Company, Gus Hill and/or Darrell Grigsby through the scheme of the True Energy Association-In-Fact, as SGS was paid to analyze the actual quality of True Energy's and/or Hills Fuel Company's coal -- the results of which SGS was reporting directly to True Energy, Hills Fuel Company, Gus Hill and/or Darrell Grigsby; and not to Eastman, despite SGS' commitment to not engage in coal analyses that posed a conflict of interest toward Eastman. With the True Energy Association-In-Fact using those analyses to determine what coal needed to be used for the non-representative Eastman coal samples.

140. Pursuant to and in furtherance of the fraudulent scheme of the True Energy Association-In-Fact, SGS, through its personnel committed multiple related acts continuously during at least the period from June 22, 2011 to February 3, 2012.

141. Each and every non-representative coal sample that was taken across state lines by SGS personnel in furtherance of the false and fraudulent scheme of the True Energy

43

Association-In-Fact violates the interstate transportation in aid of racketeering enterprises act codified at 18 U.S.C. §1952, and constitutes fraud and swindles in violation of 18 U.S.C. §1341 (among other applicable laws); perpetrated by the persons involved in the True Energy Association-In-Fact, including SGS.

142.    Each and every shipment of coal that contained lower quality coal that was not included in the SGS coal samples for that shipment, and that was shipped across state lines by True Energy in furtherance of the false and fraudulent scheme of the True Energy Association-In-Fact violates the interstate transportation in aid of racketeering enterprises act codified at 18 U.S.C. §1952, and constitutes fraud and swindles in violation of 18 U.S.C. §1341 (among other applicable laws); perpetrated by the persons involved in the True Energy Association-In-Fact, including SGS.

143.    Each and every false and fraudulent coal sample analysis report certified and sent by SGS to Eastman by mail and/or interstate wire communications constitutes mail fraud under 18 U.S.C. §1341, wire fraud under 18 U.S.C. §1343, fraud and false statements under 18 U.S.C. §1001, and/or false statements under Va. Code. §18.2-186 (among other applicable laws); perpetrated by the persons involved in the True Energy Association-In-Fact, including SGS.

144.    Each and every false and fraudulent invoice, derived from a correspondingly false and fraudulent SGS analysis report, and sent from True Energy to Eastman through mail and/or interstate wire communications constitutes mail fraud under 18 U.S.C. §1341, wire fraud under 18 U.S.C. §1343, fraud and false statements under 18 U.S.C. §1001, and false statements under Va. Code §18.2-186 (among other applicable laws); perpetrated by the persons involved in the True Energy Association-In-Fact, including SGS.

44

145.    Each and every payment received by True Energy from Eastman in payment of a false and fraudulent invoice sent by True Energy, and derived from a correspondingly false and fraudulent SGS analysis report, constitutes theft, larceny and/or embezzlement in violation of 18 U.S.C. §659, *Tenn. Code Ann.* §39-14-101, *et. seq.*, and/or Va. Code §§ 18.2-95, 18.2-111, 18.2-178, and 18.2-186 (among other applicable laws), from Eastman; perpetrated by the persons involved in the True Energy Association-In-Fact, including SGS.

146.    Each and every payment of money or other benefits to SGS personnel for non-representative coal samples for analysis constitutes bribery in violation of 18 U.S.C. §1952, and Va. Code §18.2-444 (among other applicable laws); perpetrated by the persons involved in the True Energy Association-In-Fact, including SGS.

147.    Every person and entity involved in the racketeering activities of the True Energy Association-In-Fact, including SGS, have joint and several liability to Eastman.

148.    SGS is vicariously liable for the acts and omissions of its personnel involved in the True Energy Association-In-Fact via the doctrine of respondeat superior. The employment of SGS personnel with SGS required them to take coal samples from True Energy that were representative of the coal being loaded and sold by True Energy to Eastman, and to analyze those samples and report the results therefrom directly to Eastman; all in accordance with SGS' contractual duties to Eastman. As the master of its personnel, SGS is responsible for ensuring that its personnel took the samples from True Energy in a manner consistent with the standards of care, diligence, and skill ordinarily exercised by other professionals under similar circumstances in accordance with customarily accepted good and sound professional practices and procedures; that the SGS analysis and reporting thereof to Eastman related to coal that was representative of the coal actually being loaded and sold by True Energy to Eastman; and that

45

SGS' personnel complied with the law. SGS committed to having and maintaining complete control over its personnel and to being responsible for all of its personnel and operations.

149. Alternatively, SGS ratified the acts and omissions of its personnel via its certifications of the coal sampling and analysis in each of the SGS' analysis reports of True Energy coal that SGS sent to Eastman; thereby making SGS a direct participant in the True Energy Association in Fact.

150. The acts and omissions set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. §1961(5).

151. SGS has directly or indirectly conducted and participated in the conduct of the affairs of the True Energy Association-In-Fact through the pattern of racketeering and activity described above, in violation of 18 U.S.C. §1962(c).

152. As a direct and proximate result of SGS' racketeering activities and violations of 18 U.S.C. §1962(c), Eastman has been injured in its business and property in that it has incurred at least $287,000.00 in premium losses for the shipments of coal from True Energy. In addition, Eastman has incurred unreimbursed expenses including but not necessarily limited to transportation, demurrage, and handling expenses for the fraudulent coal delivered to Eastman; increased overhead expenses incurred by Eastman in burning lower quality coal without prior notice; costs of purchasing additional coal to make up for lost BTUs in the coal provided by True Energy in an amount of at least $390,000.00; and damage and excessive wear to Eastman's equipment caused by the burning of lower quality coal without prior notice. Eastman has also incurred damages related to payments made to SGS for performance of its fraudulent coal sampling and analysis, and attorneys' fees and costs.

153.     In accordance with 18 U.S.C. §1964(c), Eastman is entitled to recover threefold the damages it has sustained and the cost of this suit, including a reasonable attorney's fee.

### COUNT THREE: RICO §1962(d)

154.     The allegations in Paragraph Numbers 1-111 above are incorporated herein by reference.

155.     As set forth above, SGS, through its employees, agreed and conspired to violate 18 U.S.C. 1962(c) through the Mountain Energy Association-In-Fact and/or the True Energy Association-In-Fact.

156.     SGS, through its personnel, intentionally conspired and agreed to directly and indirectly conduct and participate in the conduct of the affairs of the Mountain Energy Association-In-Fact enterprise and/or the True Energy Association-In-Fact enterprise through a pattern of racketeering activity.  SGS, through its personnel, knew that those predicate acts were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.  That conduct constitutes a conspiracy to violate 18 U.S.C. §1962(c), in violation of 18 U.S.C. §1962(d).

157.     As a direct and proximate result of the conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. §1962(d), Eastman has been injured in its business and property, including but not limited to Eastman's payments for false and fraudulent premium pricing of coal from Mountain Energy and True Energy; unreimbursed expenses including but not necessarily limited to freight, transportation, demurrage, and handling expenses for the false and fraudulent coal delivered to Eastman; increased overhead expenses incurred by Eastman in burning lower quality coal; costs of purchasing additional coal to make up for lost BTUs in the coal provided by Mountain Energy and True Energy; and damage and

excessive wear to Eastman's equipment, and the component parts thereof, and the replacement parts thereto, caused by the burning of lower quality coal that did not meet Eastman's specifications. Eastman has also incurred damages related to payments made to SGS for performance of its false and fraudulent coal sampling and analysis, and attorneys' fees and costs.

158. In accordance with 18 U.S.C. §1964(c), Eastman is entitled to recover threefold the damages it has sustained and the cost of this suit, including a reasonable attorney's fee.

## COUNT FOUR: BREACH OF CONTRACT

159. The allegations in Paragraph Numbers 1-111 above are incorporated herein by reference.

160. Eastman and SGS had binding and enforceable agreements wherein SGS was to perform sampling and analysis services of coal that Eastman was considering to accept from coal suppliers -- including Mountain Energy and True Energy -- during the time period of January 1, 2010 through December 31, 2012. The results of those analyses were to be used in determining whether the coal met Eastman's specifications for BTU and ash rates, and to determine the pricing of the coal sold to Eastman by the coal suppliers.

161. SGS breached its contractual obligations to Eastman by taking, or permitting its personnel to take, samples of coal from Mountain Energy and True Energy that were not representative of the coal actually being loaded and sold by Mountain Energy and True Energy to Eastman.

162. SGS breached its contractual obligations to Eastman by performing, or permitting its personnel to perform, SGS' coal sampling and analysis of coal from Mountain Energy and True Energy in a manner: inconsistent with the standards of care, diligence and skill ordinarily exercised by other professionals under similar circumstances; that was not in accordance with

48

customarily accepted good and professional practices and procedures; and that did not comply with the law.

163.     SGS breached its contractual obligations to Eastman by failing to have its personnel responsible for the coal sampling and analysis of coal from Mountain Energy and True Energy perform that sampling and analysis in a manner consistent with the terms and provisions of SGS' agreements with Eastman.

164.     SGS breached its contractual obligations to Eastman by certifying to Eastman coal sampling and analysis results related to coal from Mountain Energy and True Energy that was not, in fact, representative of coal actually being loaded and supplied by Mountain Energy and True Energy.

165.     SGS breached its contractual obligations to Eastman by performing or entering into agreements to perform services for Mountain Energy, Stanley, True Energy, Gus Hill, and/or Hills Fuel Company; that caused conflicts of interest related to, and compromised the integrity of, SGS's performance of its coal sampling and analysis for Eastman.

166.     SGS  breached its contractual obligations to Eastman by failing to disclose the conflicts of interest related to SGS performing coal sampling and analysis for Eastman of coal from Mountain Energy and True Energy; while also performing coal sampling and analysis of coal for Mountain Energy, True Energy, and/or their principals, agents or employees.

167.     SGS breached its contractual obligations to Eastman in that it performed, or alternatively permitted its personnel to perform, SGS' coal sampling and analysis obligations (related to Mountain Energy and True Energy) for Eastman with lies, deceit or a lack of honesty; and in an unethical manner that was unfair to, and in disrespect of, Eastman.

168. SGS' breaches of contract directly and proximately caused Eastman to incur damages in its business and to property, including but not limited to Eastman's payments for false and fraudulent premium pricing of coal from Mountain Energy and True Energy; unreimbursed expenses including but not necessarily limited to freight, transportation, demurrage, and handling expenses for the false and fraudulent coal delivered to Eastman; increased overhead expenses incurred by Eastman in burning lower quality coal; costs of purchasing additional coal to make up for lost BTUs in the coal provided by Mountain Energy and True Energy; and damage and excessive wear to Eastman's equipment, the component parts thereof, and the replacement parts thereto, caused by the burning of lower quality coal that did not meet Eastman's specifications. Eastman has also incurred damages related to payments made to SGS for performance of its false and fraudulent coal sampling and analysis, and attorneys' fees and costs.

169. The contractual terms between SGS and Eastman provide that Eastman shall be indemnified for the negligent acts, errors or omissions of SGS, and for SGS and its personnel's failure to comply with the law. Those terms further provide that Eastman is entitled to recover its attorneys' fees and costs reasonably incurred if it is the prevailing party.

170. Eastman's has incurred compensatory damages as a result of SGS' breaches of its agreements with Eastman in the amount of at least one million three hundred thirty-seven thousand dollars ($1,337,000.00), plus attorneys' fees and costs.

171. SGS' breaches of its contractual agreements with Eastman were fraudulent, intentional, malicious, and/or reckless, thereby entitling Eastman to punitive damages.

WHEREFORE, Eastman prays the Court for the following relief:

50

A. That the Court enter judgment in favor of Eastman on the claims set forth in Eastman's Complaint, together with interest at the highest legal rate until paid in full;

B. That the Court award Eastman compensatory damages in an amount of at least one million three hundred thirty-seven thousand dollars ($1,337,000.00);

C. That the Court award Eastman its attorneys' fees and costs pursuant to its contractual agreements with SGS;

D. That the Court treble the damages proven and award Eastman its reasonable attorneys' fees under Eastman's RICO claims in accordance with 18 U.S.C. §1964(c);

E. That the Court grant punitive damages on Eastman's breach of contract claim in an amount of at least four million dollars ($4,000,000.00);

F. That the Court tax SGS with all costs of this action, including but not necessarily limited to court costs and discretionary costs;

G. That the trial in this action be by a jury; and

H. That the Court grant Eastman such other relief as the Court deems just and appropriate.

DATED this 31st day of December 2015.

Respectfully submitted,

**EASTMAN CHEMICAL COMPANY**

s/ Gary L. Edwards
Gary L. Edwards, Esq. (TN Bar No. 020058)
Brent B. Young, Esq. (TN Bar No. 019667)
Ronald S. Range, Jr., Esq. (TN Bar No. 013928)
BAKER, DONELSON, BEARMAN,
CALDWELL & BERKOWITZ, P.C.
100 Med Tech Parkway, Suite 200
P.O. Box 3038
Johnson City, TN 37602

51

(423) 928-0181 (phone)
(423) 928-5694 (facsimile)
gedwards@bakerdonelson.com

*Counsel for Plaintiff Eastman Chemical Company*